IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DEMARKO DEON COOPER,      ) | |
|        Petitioner,      ) | |
|       ) | |
| v.      ) | No. 3:16-CV-1285-L |
|       ) | |
| LORIE DAVIS, Director, Texas      ) | |
| Dept. Of Criminal Justice, Correctional      ) | |
| Institutions Division,      ) | |
|        Respondent.      ) | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions and Recommendation of the United States Magistrate Judge follow.

**I.  Procedural Background**

Petitioner filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction for aggravated robbery with a deadly weapon, enhanced. *State of Texas v. Demarko Deon Cooper*, No. F-1127720-H (1st Crim. Dist. Ct., Dallas County, Tex., May 3, 2012). Petitioner was sentenced to fifty years in prison.

On August 26, 2013, the Fifth District Court of Appeals modified the judgment to show that Petitioner pled not true to the enhancement paragraphs, and affirmed in all other respects. *Cooper v. State*, No. 05-12-00671-CR, 2013 WL 4568311 (Tex. App. – Dallas, 2013). Petitioner did not file a petition for discretionary review.

On February 13, 2014, Petitioner filed a state petition for writ of habeas corpus. *Ex parte Cooper*, Application No. 82,517-01. On October 7, 2015, the Texas Court of Criminal Appeals denied the petition without written order on the findings of the trial court.

On May 5, 2016, Petitioner filed this § 2254 petition. He argues:

1. The prosecution committed error by not following proper pretrial and in-court identification procedures;

2. He received ineffective assistance of counsel when his trial counsel:

    a. Failed to object or suppress the pretrial and in-court identification;

    b. Failed to put on a defense;

    c. Failed to suppress DNA evidence;

    d. Failed to object to Officer Hale's hearsay testimony;

3. The trial court abused its discretion when it denied his motion for appointment of an expert witness; and

4. The evidence was insufficient to support his conviction.

On July 15, 2016, Respondent filed her answer. On August 9, 2016, Petitioner filed a reply. The Court now finds the petition should be denied.

## II.  Factual Background

Saleem Lakhani ("Saleem") testified that he and his father, Hakim Ali ("Hakim"), owned a convenience store called the "Dash-In Grocery" in Garland, Texas. (ECF No. 8-10 at 14–15.) Saleem stated he and his father arrived at the store on Saturday November 12, 2011, shortly after 7:00 a.m. (*Id*. at 19; 79–80.) Just before 8:00 a.m., a man walked into the store and began talking to Hakim. (*Id*. at 20.) The man was a black male, approximately five feet five inches tall,

and weighed between 150 and 170 pounds. (*Id*. at 24–25.)  He was wearing a red baseball cap and red t-shirt. (*Id*. at 25.)  Saleem noticed that Hakim, who often had difficulty communicating with customers in English, appeared to be having trouble communicating with the man. (*Id*. at 20.) Saleem decided to go assist his father. (*Id*.)

As Saleem approached his father and the man, the man pulled out a gun and fired a shot. (*Id*.)  The man told Saleem to open the cash drawer, but the man would not stop shooting. (*Id*. at 22.)  Saleem believed the man fired four or five shots. (*Id*. at 23.)  The man pointed the gun at both Saleem and Hakim. (*Id*.)  Saleem tried to reach the button to activate the silent alarm, but he could not reach it. (*Id*. at 24.)  Saleem testified that as the man was getting cash from the register, Hakim began to come around the counter. (*Id*. at 25, 33.)  The man dropped the cash and ran from the store. (*Id*.)  The red cap the robber was wearing was found by the police on the ground outside of the store. (*Id*. at 47, 59.)

On November 17, 2011, Saleem observed a photo lineup. (*Id*. at 50.)  Saleem identified one of the men from the lineup as the robber; however, the man he picked was not Petitioner. (*Id*. at 52.)  On December 19, 2011, Saleem observed a second photo lineup in which he identified a man as the robber. (*Id*. at 53.)  The man Saleem identified was Petitioner. (*Id*. at 107.)

Officer James Rogers ("Officer Rogers"), a senior forensic investigator with the Garland Police Department, testified that he was called to process the scene at the Dash-In Grocery on November 12, 2011. (*Id*. at 56–58.)  The items that Officer Rogers collected from the crime scene included: a cap that was on the pavement behind the building, a bullet jacket from inside the building, a DNA swab of the counter, currency that was handled by the robber, and a

cardboard display that was stepped on by the robber. (*Id*. at 59.) Officer Rogers collected the hat because he was informed that it fell from the robber's head when he ran away. (*Id*. at 60.) Officer Rogers was unable to lift any fingerprints from the cash register or a cardboard display. (*Id*. at 59.)

Detective I.C. Hale ("Detective Hale") of the Garland Police Department testified that he was assigned to investigate the robbery of the Dash-In Grocery. (*Id*. at 67–68, 70.) At the start of his investigation, Detective Hale spoke with Saleem and reviewed the surveillance tape from the store. (*Id*. at 71–72.) Detective Hale was informed that the robber dropped a cap when he was running from the store. (*Id*. at 72.) Detective Hale was able to observe this on the surveillance video. (*Id*. at 72.) Witnesses informed the detective that the suspect got into a gold Ford Explorer. (*Id*.) They were able to provide Detective Hale with the license plate number for the vehicle. (*Id*.) This was Detective Hale's first lead as to the identity of the robber. (*Id*. at 75.)

Detective Hale determined that the Ford Explorer belonged to a woman named Shawnda Williams ("Ms. Williams"). (*Id*. at 76.) The address listed on the vehicle registration, however, was not Ms. Williams' current address; therefore, Detective Hale asked the Richardson Police Department for assistance in locating the vehicle. (*Id*. at 78.) Detective Yoshida, with the Richardson Police Department, was able to provide Detective Hale with the address where the vehicle was seen on November 4, 2011. (*Id*.) Detective Hale located the vehicle and had the vehicle seized and impounded on November 16, 2011. (*Id*. at 79.) No fingerprints were found in the vehicle. (*Id*. at 81.)

The day after Ms. Williams' vehicle was impounded, she contacted Detective Hale and agreed to come to the police department to speak with the detective. (*Id*. at 78–79.) Ms.

Williams informed Detective Hale that the vehicle belonged to her, but she had loaned it to a man that she knew as Robert James. (*Id*. at 81.) Ms. Williams knew which apartment Robert James stayed in, but she did not know anything else about him. (*Id*.) Ms. Williams told Detective Hale that Robert James borrowed the vehicle on the Thursday before the robbery and returned it the Tuesday after the robbery. (*Id*.) The day after Detective Hale met with Ms. Williams, she called him to let him know that the man she knew as Robert James had called her and told her to say she did not know anything about where her car had been. (*Id*. at 82.)

Detective Yoshida was able to provide Detective Hale with the name Robert Leon Simpson ("Mr. Simpson") for the man that Ms. Williams knew as Robert James. (*Id*.) Detective Yoshida also informed Detective Hale that Mr. Simpson had reported a robbery a week or two before the robbery of the Dash-In Grocery, and the suspect in that case was named Daniel Norris ("Mr. Norris"). (*Id*.) Detective Yoshida suggested that Mr. Norris might be a person of interest in the Dash-In Grocery robbery. (*Id*.)

Detective Hale testified that at that point in the investigation, both Mr. Simpson and Mr. Norris were persons of interest in the Dash-In Grocery robbery. (*Id*. at 83.) Detective Hale obtained a photo of Mr. Norris and had Saleem look at a photo lineup containing the photo. (*Id*.) Saleem picked another person's photo. (*Id*.) Hakim also looked at the photo lineup, and he picked Mr. Norris's photo. (*Id*.) Detective Hale testified that Mr. Norris fit the general description of the robber. (*Id*. at 84.) An arrest warrant was issued for Mr. Norris and Mr. Simpson. (*Id*. at 86, 89.)

When Mr. Norris was arrested, he spoke with Detective Hale. (*Id*. at 86.) Detective Hale showed Mr. Norris the surveillance video from the Dash-In Grocery. (*Id*.) Mr. Norris informed

Detective Hale that the man in the video looked like him, but was not him. (*Id*.) A buccal swab was collected from Mr. Norris. (*Id*. at 87.) Detective Hale testified that the investigation continued because Detective Hale was skeptical about whether he had the right man. (*Id*. at 88.)

As for Mr. Simpson, Detective Hale stated that he was in his sixties, did not fit the description of the shooter, and did not look like the man in the surveillance video. (*Id*. at 90.) However, Detective Hale believed that Mr. Simpson was involved in the robbery because Ms. Williams had loaned him her vehicle. (*Id*. at 91.) Detective Hale believed that Mr. Simpson may have been the driver or a passenger at the time of the robbery. (*Id*.)

Mr. Simpson came to speak with Detective Hale at the police department and provided a voluntary statement. (*Id*.) Mr. Simpson informed Detective Hale that he had borrowed Ms. Williams' vehicle, and that two men, named "Marco" and "Black," were in the vehicle with him during the robbery. (*Id*.)

The man Mr. Simpson referred to as "Black" was identified as James Wafer ("Mr. Wafer"). (*Id*.) Mr. Wafer, who was approximately forty-nine or fifty years old and weighed between 240 and 250 pounds, did not fit the description of the gunman. (*Id*. at 93.) Mr. Simpson also told Detective Hale that the hat that was worn by the shooter belonged to Mr. Wafer. (*Id*. at 94). Mr. Simpson identified "Marco" as the shooter and Mr. Wafer as the driver. (*Id*. at 95).

Mr. Williams initially identified a photograph of a man named DeMarco Crist as the shooter "Marco." (*Id*. at 99.) He later told Detective Hale that Crist was not the shooter. (*Id*. at 99, 134.) Mr. Simpson also gave Detective Hale two potential addresses where the shooter could be found. (*Id*. at 96.)

Detective Hale went to 11601 Audelia, an address provided by Mr. Simpson, and knocked on the door of apartment 174. (*Id*. at103.) The woman who answered the door informed Detective Hale that she believed the man he was looking for stayed at apartment 276. (*Id*. at 104). The apartment manager also said that it was possible the man Detective Hale was looking for stayed at apartment 276. (*Id*.)

Detective Hale contacted Dallas Police Officer Colunga, who was familiar with the apartments located at 11601 Audelia and a man named "Marco." (*Id*. at 105.) Officer Colunga put the location under surveillance. (*Id*.) Through the surveillance, they obtained the name of Petitioner, Demarko Cooper. (*Id*.) Officer Colunga arrested Petitioner. (*Id*. at 106.)

Detective Hale obtained a buccal swab from Petitioner. (*Id*. at 109.) Detective Hale had Saleem come back to the police department and look at a photo lineup that included Petitioner. (*Id*. at 107.) Saleem identified Petitioner as the shooter. (*Id*.)

Rachel Burch ("Ms. Burch"), a forensic DNA analyst at the University of North Texas Center for Human Identification, performed forensic testing on the red baseball cap that was collected from the crime scene. (*Id*. at 59, 154.) Ms. Burch testified that she was able to get DNA results off the cap. (*Id*. at 158.) Ms. Burch testified there was DNA from more than one person on the cap. (*Id*. at 161.) Ms. Burch explained that there was a major contributor and a minor contributor; meaning that one person contributed more DNA than the other. (*Id*.) Mr. Norris was excluded as a contributor. (*Id*. at 163.) Petitioner "matched the major contributor at all 15 locations, therefore, he could not be excluded as the major contributor" of the DNA on the cap. (*Id*. at 164.) The DNA profile of the major contributor would appear in one out of 466

quintillion individuals. (*Id*. at 165.) Ms. Burch explained that statistic by stating that if there were 71 billion planet Earths, one person on each planet would have that profile. (*Id*. at 166.)

On May 3, 2012, the jury convicted Petitioner of aggravated robbery with a deadly weapon.

## III.  Discussion

### 1.     Standard of Review

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254 provide:

> (d)     An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id*.

**2.      Procedural Bar**

Respondent argues that Petitioner failed to raise the following claims in state court: (1) the evidence was insufficient to support the conviction; and (2) counsel was ineffective when he (a) failed to object to or suppress the pretrial and in-court identification; (b) failed to put on a defense; and (3) failed to suppress DNA evidence.

A federal court will ordinarily not review a claim where a petitioner has not presented the claim to the highest court of the state and the state court to which he would be required to present his claims would now find the claim procedurally barred. *See Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991). Here, Petitioner has failed to present these claims in state court. Accordingly, the Texas Court of Criminal Appeals has not reviewed the claims. If this Court were to require Petitioner to return to state court to exhaust these claims, they would be subject to dismissal because a second state habeas petition would be subject to an abuse-of-the-writ dismissal.

To overcome the procedural bar, a petitioner must demonstrate: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a "fundamental miscarriage of justice." *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750). Petitioner has stated no cause for his failure to present these claims to the Texas Court of Criminal Appeals.

Petitioner has also failed to demonstrate the need to prevent a miscarriage of justice. This exception is "confined to cases of actual innocence, 'where the petitioner shows, as a factual matter, that he did not commit the crime of conviction.'" *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995)). To establish the

required probability that he was actually innocent, a petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show it was more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id*. (citing *Schlup*, 513 U.S. at 327). Petitioner has presented no new, reliable evidence showing that it was more likely than not that no reasonable juror would have convicted him. Petitioner has not overcome the state procedural bar. Accordingly, the procedural default doctrine bars federal habeas relief on these claims.

3.    **Prosecutorial Misconduct**

Petitioner claims the prosecutor committed misconduct during trial. He states that complainant Saleem was asked to identify Petitioner at trial and that Saleem instead identified a juror as the Petitioner. Petitioner claims the prosecutor then produced a photo of Petitioner and again asked Saleem if he could identify Petitioner in the courtroom.

Prosecutorial misconduct implicates due process concerns. *Foy v. Donnelly*, 959 F.2d 1307, 1316 (5th Cir. 1992). When a petitioner asserts a due process violation, the Court must determine whether the prosecutorial comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In the habeas context, the appropriate review for such allegations is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly,* 416 U.S. at 642).

The record disputes this claim. At trial, the prosecutor asked Saleem if he saw the man who robbed him in the courtroom. Saleem identified a juror as the robber. (ECF No. 8-10 at 26.) The prosecutor did not inform Saleem that he had identified someone other than Petitioner.

The prosecutor then presented Saleem with a number of photos, including the police lineup that included Petitioner's photo. (*Id*. at 46.) The prosecutor, however, did not ask Saleem to again identify the person who robbed him. The only identification that Saleem made at trial was the identification of a juror as the robber. Petitioner's claim of prosecutorial misconduct is without merit.

### 4.     Ineffective Assistance of Counsel

Petitioner claims he received ineffective assistance of counsel. To sustain a claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense so gravely as to deprive Petitioner of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court stated that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*.

Even if counsel is proven deficient, a petitioner must prove prejudice. To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Id*. "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id*. (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Petitioner claims his counsel was ineffective when counsel failed to raise a hearsay objection to Officer Hale's testimony. The record shows Officer Hale testified that co-defendant Robert Simpson told him that Petitioner committed the robbery and fired the gun. (ECF No. 8-10 at 91-97.) The state court found this testimony to be hearsay and a violation of Petitioner's right to confrontation, but determined that even if defense counsel had raised an objection, Petitioner failed to show a reasonable probability that the result of the trial would have been different. (ECF No. 8-40 at 6-7.) The court explained that DNA testing from the hat that fell off the robber's head showed the presence of Petitioner's DNA. (*Id*.)

The Court finds that the state court's decision to deny relief on this claim is not unreasonable. Although co-defendant Simpson's statements could have been excluded by a defense objection, Detective Hale could still have testified that a search of the license plate from the get-away car led officers to arrest co-defendant Simpson, and that a discussion with Simpson led them to arrest Petitioner. Saleem also identified Petitioner in a pre-trial lineup, even though he could not identify Petitioner at trial. Finally, the video of the robbery showed the robber wearing a hat that fell off as he ran. DNA testing of the hat showed that Petitioner was a major contributor of the DNA found on the hat. Petitioner has failed to show that but for his counsel's objection to Hale's testimony, there is a reasonable probability that the result of the trial would have been different.

Additionally, Petitioner has not showed that his counsel's conduct fell outside of reasonable trial strategy. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). Detective Hale testified that Simpson initially identified a photograph of another man, Demarko Crist, as the robber. (ECF No. 8-10 at 99.) Detective Hale admitted that Simpson was adamant

that Crist was the person he conspired with to commit the robbery. (*Id*. at 132.) This interview was also videotaped. (*Id*. at 128.) Detective Hale testified that Simpson later called him down to the jail and told him Crist was not the person who committed the robbery. (*Id*. at 99, 134.) Defense counsel showed that this recantation by Simpson was not videotaped, and that Detective Hale made no note in his report that Simpson had recanted. (*Id*. at 134,138-39.) Defense counsel therefore used Detective Hale's testimony about Simpson's statements to argue that Crist was the robber, not Petitioner. Petitioner has failed to show that the state's denial of this claim was unreasonable.

**5.      Trial Court Error**

Petitioner argues the trial court abused its discretion when it denied his motion for appointment of an expert DNA witness.

On federal habeas review of state court convictions, a federal harmless error standard applies. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–38 (1993). To be actionable, a trial court error must have " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 637 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)). Under this standard, a petitioner is not entitled to federal habeas relief based on trial error unless he can establish that the error resulted in actual prejudice. *See Brecht,* 507 U.S. at 637. "[A] state defendant has no constitutional right to an errorless trial." *Bailey v. Procunier,* 744 F.2d 1166, 1168 (5th Cir. 1984).

Petitioner argues a DNA expert could have testified that whether Petitioner was a major or minor contributor of the DNA on the hat, this did not show who was wearing the hat at the time of the offense. Petitioner, however, has failed to submit any evidence that a DNA expert

would have testified favorably for the defense *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) ("for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."); *see also*, *Martin v. McCotter*, 796 F.2d 813, 819 (5th Cir. 1986) ("hypothetical or theoretical testimony will not justify the issuance of a writ . . . ."). This claim is conclusory and should be denied.

### 6.   Summary

Petitioner is lawfully restrained because he has failed to prove that he has been denied a constitutionally protected interest. Accordingly, the state courts' decision to deny relief is not contrary to or does not involve an unreasonable application of clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### IV.  Recommendation

For the foregoing reasons, the Court recommends that Petitioner's habeas corpus petition pursuant to 28 U.S.C. § 2254 be denied with prejudice for failure to make a substantial showing of the denial of a federal right.

Signed this 1st day of November, 2017.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).